Dorothy S. Williams *et al. vs.* Rhode Island Hospital Trust Company, *Ex'r.*

W. Wellington Vandeveer *et al. vs.* Rhode Island Hospital Trust Company, *Ex'r.*

Adelaide A. Sluiter *et al. vs.* W. Wellington Vandeveer *et al.*

JUNE 30, 1958.

Present: Condon, C.J., Andrews and Paolino, J.J.

24

ANDREWS, J.   These three bills in equity were brought by the heirs-at-law of William H. Williams, husband of Emily M. Williams, late of the city of Newport, deceased.   They are based upon or grow out of the breach of her alleged contract with him to make and keep unrevoked a will giving to his heirs-at-law certain amounts of property.   By agreement the cases were tried together by a justice of the superior court who, after finding that no such contract had been proved, ordered the entry of a decree in each case denying and dismissing the bill of complaint.   Such decrees were entered and from them the complainants have appealed to this court.

The complainants in the first case, Equity No. 2577, filed July 29, 1953, are the three nieces of the husband William H. Williams, hereinafter called Mr. Williams, and the respondents are the Rhode Island Hospital Trust Company, executor of the will of Emily M. Williams, hereinafter referred to as Mrs. Williams, and the devisees and legatees named in her last will.   As finally amended, this bill alleges that there belonged to Mr. Williams, in his lifetime, certain property and securities standing in his own name and in addition thereto certain property and securities standing in the name of his wife, which had been purchased with his funds; that they agreed that said property and securities were in equity the estate and property of Mr. Williams and would be under his absolute control as if standing in his own name; and that Mr. Williams and Mrs. Williams, prior to the execution of their last wills, in consideration of mutual promises:

> "* * * did promise and agree each with the other that they would make, execute and leave unrevoked at death a valid last will and testament by which each

would give, devise and bequeath to the other, all or substantially all of his or her property and estate * * * that upon the death of the said Emily Matilda Williams, if she were the survivor, it was mutually understood and agreed that she would execute and leave unrevoked at her death a last will and testament wherein she would give, devise and bequeath to the heirs-at-law and family of the said William H. Williams, as designated and directed by him, the property and estate, or substantially its equivalent in value, which the said Emily Matilda Williams had received from the said William H. Williams under his last will and testament; that in addition thereto, in consideration of the purchase of and the taking and holding of said securities and property in her name as above alleged, that Emily Matilda Williams would on her death leave a good and valid last will and testament wherein and whereby she would give and bequeath to the heirs-at-law and family of said William H. Williams, as designated and directed by him, the sum of One Million ($1,000,000) Dollars, or four twentieths (4/20ths) of the rest, residue and remainder of her property and estate."

By her last will dated January 12, 1950, Mrs. Williams gave one of Mr. Williams' nephews, his namesake and godson, William Wellington Vandeveer, hereinafter called Wellington, 8/20ths of her residuary estate, a sum at least equal to the total of the claims of his nieces and nephews, but this was the only bequest to any of the nieces or nephews of her husband.

In the second case, Equity No. 2578, filed September 23, 1953, Wellington and his brother Almuth are the complainants and the respondents are the same as in the first case. While denying the existence of any contract such as alleged in the first case, they claim that if any such contract was in fact made they are entitled to their share under it, and the bill concludes with appropriate prayers. To allay the fears of the nieces that unless the Vandeveers appealed

their case the nieces' appeals might be dismissed, the Vandeveers appealed but having won they are content.

In the third case, Equity No. 2579, filed February 11, 1955, the nieces are the complainants and Wellington and the trust company are the respondents. The distinctive allegations of this bill as amended are:

> "3. That on or about June 19, 1941 in consideration that said William Henry Williams would by his last will and testament devise and bequeath to her the residue of his estate after the payment of his just debts, funeral expenses and the expenses of administration including taxes, said Emily Matilda Williams promised said William Henry Williams that in case she survived said William Henry Williams, she would by her last will and testament devise and bequeath to his relatives, in the manner provided by his last will and testament for the disposition of his said residue in case she did not survive him, all property received by her under his said last will and testament plus 4/20ths of the residue of her estate remaining after the payment of her just debts, funeral expenses, the expense of administration including taxes and certain legacies."

> "6. That said Emily Matilda Williams died as aforesaid without performing her said promise, but on the contrary by her said last will and testament she devised and bequeathed to one of said nieces and nephews, to wit, said William Wellington Vandeveer, 8/20ths of said residue of her estate, thereby intending to devise and bequeath the 4/20ths of said residue mentioned in paragraph 3 hereof and the 4/20ths of said residue representing the property received by her under the last will and testament of said William Henry Williams, instead of devising and bequeathing said 8/20ths of said residue to all said nieces and nephews equally."

The bill further alleges that Wellington holds his bequest as a constructive trustee for all the heirs-at-law. It thus appears that in the first two cases the complainants sue as third party beneficiaries of a contract and in the third case they sue as the beneficiaries of a constructive trust. As

the finding of the trial justice of "no contract" strikes at the foundation of all the cases, we need not go further into the rather complicated pleadings in these cases.

Owing to the sustaining of a demurrer to a bill of complaint filed earlier than any of these three cases, on the ground that the bill did not allege that the complainants had filed a statement of their claims in the probate court, the earlier case was abandoned and claims were filed in the probate court on January 17, 1953. The claims of the nieces are identical and the foundation thereof is stated in each claim as follows:

> "Said claim is founded on an agreement made between William H. Williams, husband, and Emily Matilda Williams, his wife, whereby they each, for mutual considerations, agreed to execute and leave unrevoked at death a valid last will and testament by which each would give, devise and bequeath all of his or her property and estate to the survivor of them and said survivor, as part of said consideration, would execute and leave unrevoked at his or her death a valid last will and testament which would give, devise and bequeath the property and estate so left to him or her by the other to and among the family and heirs-at-law of such other, and in the case of said William H. Williams, to and among his nephews and nieces, equally, *per capita,* of which the claimant is one."

It was stipulated between the parties that Mr. Williams' net estate was $882,281.64 so the proportionate share of the three nieces would be approximately $529,000. It will be noted that there is nothing in the claims as filed in the probate court covering the extra million dollars or the 4/20ths of Mrs. Williams' estate above referred to. In this connection the respondent trust company contends that the suit against Wellington as a constructive trustee was brought to avoid the limitations imposed upon the nieces' recovery by their claims as filed in the probate court.

So much for the pleading background. We now turn to the factual background much of which is not in dispute

and some of which is covered by a stipulation signed by the parties. To avoid repetition we shall comment on some phases of the evidence as we come to them.

Mr. and Mrs. Williams were married in 1917 when both were in their early forties. He, at that time, was worth a million dollars which he had earned himself. She was worth between four and five million dollars, most if not all of which she had inherited. It was stipulated that at all times during their marriage her fortune was four or five times greater than his and that her net estate would probably be about four and a half million dollars. Mr. Williams was then engaged in business, and although Mrs. Williams had a law degree she did not practice but attended to her property. They kept their property separate although Mr. Williams gave his wife advice on investments. He took over a defaulted mortgage which she owned, the history of which may have been the foundation for the allegation in the first bill of complaint relative to securities standing in her name that belonged to him. As will be later seen, this was not the case and this claim was abandoned.

Mr. Williams was a person of high character and industry. Mrs. Williams was a woman of high character but inclined to be domineering although there is no evidence that she and her husband did not live happily together. In fact both sides agree that they were happily married. Probably by reason of her legal training Mrs. Williams felt quite competent to instruct their lawyers as to how they should draw legal instruments and it was her practice to submit to lawyers, for their advice and for revision, drafts of wills and codicils for herself and her husband.

Mr. and Mrs. Williams had no children. When they were married Mr. Williams had three brothers and two sisters to whom he appeared to have been very much attached and whom he helped from time to time, but as time went on and his brothers and sisters died he seemed to have lost touch with some of his nieces and nephews. Mrs. Williams'

maiden name was Coddington. Her father was divorced from his first wife by whom he had a son who went to live with his mother. Mrs. Williams was the only child of her father's second marriage. She did not care for her half brother although she did like his daughter. She also had some cousins in the Schell branch of the family, her mother's people, from which most of her money came, and one of whom she liked very much. It is quite clear that both Mr. and Mrs. Williams felt that their separate estates should go back to the family of the first to die after the survivor had had it for the rest of his or her life. The real nub of this case is: Did they seek contractually to bind each other to make such a disposition and if so to whom and in what proportions?

This couple made many wills and codicils but just when they started to do so is not clear. Some of these wills and codicils were not executed and the contents of some were not proved. The complainants introduced copies and other evidence of the contents of these documents, claiming that they at least tended to prove the contract alleged to have been made by Mr. and Mrs. Williams. The first and only complete set of wills and codicils in evidence are those executed in March and June of 1932 while the couple were still living in New York. In March of that year Mr. Williams made a will in which he gave all his property to his wife and at the same time he executed a codicil, to take effect if she predeceased him, whereby he gave all the property he might receive from her *less* a million dollars to her people and her charities. All his own property *plus* a million dollars he gave to his brothers and sisters and to the two children of a deceased sister, but he treated his brothers and sisters quite *unequally*.

In June of that year Mrs. Williams made a will in which, after making special gifts amounting to some $20,000, she gave the residue to her husband. At the same time she executed a codicil to take effect if her husband predeceased

her whereby she gave all that she might receive from her husband *plus* a million dollars to the same persons and in the same proportions Mr. Williams had provided in his codicil of the previous March, with the exception that the share Mr. Williams had given to a brother, who had died in the meantime, was divided equally between his surviving brothers.

Mr. and Mrs. Williams moved to Newport in the 1930s. In 1941 they consulted the late William R. Harvey about their wills. He was a Newport attorney with whom they were acquainted and who had done some legal work for them. Mrs. Williams brought to Mr. Harvey a portfolio of previous wills and codicils, parts of such documents, and drafts of parts of wills and codicils. Mr. Harvey prepared a will and codicil for each and at their suggestion he followed the will and codicil pattern although he suggested other methods. By his will, executed June 19, 1941, Mr. Williams gave all his property to his wife and at the same time he executed a codicil, to take effect if she predeceased him, in which he gave 4/20ths of what he might receive from his wife and all his own property to his nieces and nephews, his then heirs-at-law, equally. He gave the rest of his wife's property to his wife's relatives and charities. It is to be noted that he does not refer to the million dollars mentioned in his codicil of March 1932, but they may have felt that 4/20ths of what he might receive from his wife would approximate that sum. It is not unlikely that Mrs. Williams felt that her husband had increased her estate by a million dollars or so and that that amount ought to be treated as a part of his property, but such is not the theory of the complainants.

While it is admitted that Mrs. Williams actually executed a will and codicil at the same time her husband executed his in June 1941, the originals and copies were not produced. Mr. Harvey in his memoranda which were introduced in evidence says that Mrs. Williams obtained his

copies when she executed her next will. The respondents point to the lack of definite evidence as to the total of the pre-residuary legacies, which were admittedly in Mrs. Williams' will of 1941, as bearing upon the allegation that each agreed to give to the other "all or substantially all of his or her property and estate." The pre-residuary gifts in Mrs. Williams' will of 1932 could well be called unsubstantial in view of the size of her estate of several millions. In one of his memoranda Mr. Harvey stated that she made only "a few pecuniary legacies." Of course the amount of each could have been large and the total very large. Mr. Harvey's memoranda and exhibits strongly indicate that Mrs. Williams' codicil of June 1941 was like hers of June 1932—the complement of Mr. Williams' codicils. In other words, the wills and codicils of 1941 were drawn on the same plan as those of 1932.

When the executor found out, soon after Mrs. Williams' will was probated, that the nieces were going to make a claim against the estate, Harold B. Tanner of counsel for the trust company telephoned Mr. Harvey and the latter said he had never heard of such an agreement and that neither Mr. Williams nor Mrs. Williams had ever mentioned such a thing to him.

Mr. Williams died June 19, 1943 leaving unaltered his will and codicil of June 19, 1941. The will was duly probated in Newport. On July 1, 1941 Mrs. Williams made a will in which she gave 3/20ths of her residuary estate to Wellington's brother and the three nieces, but she gave Wellington alone 3/20ths of her estate and disposed of the balance thereof among her relatives and charities. This will was drawn by Mr. Harvey and he drew another will for her in October 1944 in which she gave Wellington 5/20ths of her residuary estate and the nieces 2/20ths to be divided equally between them. Mrs. Williams executed a codicil in May 1946 but it has no particular significance. On January 14, 1947 she made still another will bequeath-

ing 7/20ths of her residuary estate to Wellington but she made no mention of her husband's nieces and his other nephew.

Mrs. Williams, who was a prolific will maker, made several more wills before she died. Her last will was dated January 12, 1950. In this will she gave 8/20ths of her residuary estate to Wellington or his issue per stirpes and made no mention of any of her husband's nieces and his other nephew.

Mrs. Williams died August 8, 1952 and almost immediately the nieces consulted Emile E. Rathgeber, a lawyer in Long Island, New York. Mr. Rathgeber was a boyhood friend of Mr. Williams. He did considerable work for both him and his wife over a long period of time and he handled certain tax problems of Mr. Williams' estate for Mrs. Williams. Mr. Rathgeber has the nieces' claims on a contingent fee basis.

As stated near the beginning of this opinion, a suit was started and, following a demurrer, was abandoned and the nieces filed their claims in the probate court under date of January 15, 1953. These claims had been submitted to Mr. Rathgeber's firm for approval before they were filed. Mr. Rathgeber had engaged Mr. Harvey to represent the nieces locally and under date of August 4, 1953 Mr. Rathgeber furnished Mr. Harvey's office (Mr. Harvey had died the previous May) a memorandum, which Mr. Rathgeber testified took two days to prepare, setting forth what he knew that might support the nieces' claim. In this 1953 memorandum he said that in December 1945 "Mrs. Williams * * * stated, *without any prompting of any kind* by me, that she was redrafting her Will, or intending to redraft her Will, in Newport, and that she intended to give a *million* dollars to the Williams family as she had agreed to do in the lifetime of Mr. Williams * * *." (italics ours) The memorandum concluded with the following statement: "It is writer's belief that Mr. and Mrs. W. H. Williams made a

firm and solemn agreement and contract with each other that whatever Mrs. Williams would inherit from her husband was to be bequeathed by her back to his family after she had the use and enjoyment of the money for the period of her lifetime, and likewise that any moneys which Mr. Williams may have inherited from his wife were to be returned to her family, or those whom she designated, at the close of his life."

At the trial in December 1955, about two years after the memorandum was made, Mr. Rathgeber testified as to Mrs. Williams' statement which he said was made in December 1945 as follows: "I'm going to redraft my will, and I'm going to carry out the agreement, our agreement, whereby I am to give to Mr. Williams and his nieces and nephews, Mr. Williams' family and his nieces and nephews all the monies that I received from his estate, plus one million dollars." On cross-examination Mr. Rathgeber several times denied making the memorandum but his local trial counsel finally forced him to admit it.

The complainants called Edward L. Norton, a public accountant, who for a great many years worked for one of Mr. Williams' principal companies and who did work for both Mr. and Mrs. Williams over a considerable period. The complainants' counsel first examined him in an attempt to prove their claim that there was a million dollars in Mrs. Williams' investments that belonged to Mr. Williams. He so completely showed that this was not the case, the claim was abandoned. He was also asked certain questions as to what Mr. Williams had said about the wills and codicils. Mr. Norton suggested to Mr. and Mrs. Williams that they abandon the will and codicil arrangement in favor of some form of trust but they rejected his suggestion. Mr. Norton said that Mr. Williams stated he did not think Mrs. Williams would like that suggestion and using codicils was something she liked to do and that was all that was necessary. He also testified that Mr. Williams said "he expected

to carry out the codicils that were in the wills as far as his action was concerned." He also testified that Mr. Williams said "he knew that Mrs. Williams would carry out his plans."

Louis Roman, an associate of Mr. Rathgeber, to whom the latter said he turned over the handling of some of Mrs. Williams' affairs in New York, testified but his admitted testimony is of no great significance. The nieces testified but all they could offer was that Mrs. Williams merely tolerated them.

The respondents called some of Mrs. Williams' relatives who said they had never heard of any contracts and knew nothing about the contents of the wills and codicils. However, one of them did testify that while visiting Mrs. Williams in Newport in 1950 or 1951 Mrs. Williams called her aside and said to her: "Don't you think Will's money should go to his side of the family and my money should be kept on my side of the family?"

The most important piece of evidence relied upon by the respondents is a letter written by Mrs. Williams to her husband between 1931 and 1933 and placed and sealed by her sometime between 1936 and 1938 in an envelope on which she wrote: "To be opened after my death." The letter reads as follows:

"Dear Will:

My father's first wife had deserted him for ten years before he divorced her and she married another man at once—At the time of the divorce my father's son Andrew being over fourteen years old was allowed to choose with which parent he would live—he chose his mother and my father being left entirely alone made a new life for himself. I never saw Andrew Coddington until I was eighteen years old when my uncle Clifford died & it was convenient for Andrew to be friends with me so that I could keep him informed about family matters, while he was in Europe. I wish to leave some money to his daughter Elizabeth because of my

personal friendship for her and because I believe that money should return to the family from which it came not from any sense of duty. I think I received about $200,000 from the Coddington family. There is no one except Elizabeth to whom I feel the slightest obligation or affection. I would like the descendants of my cousin Katherine Schell Cragin to inherit my estate as they are the collateral relatives of my uncle Augustus Schell from whom the money came who have been kind to my mother and myself. My mother's nieces have never shown any affection for her. They used to send her flowers at Christmas and Easter which I always returned in kind. They never called upon her nor invited her to their homes as it would have been natural for them to do.

This letter expresses my sentiments but is in no way binding upon your actions in any way.

Devotedly

Kittens."

The foregoing are, we believe, the important parts of the evidence and it is upon this that the trial justice made his decision.

The complainants' reasons of appeal are divided into two classes: first, those directed to the decision; and second, those directed to the rulings excluding evidence. We shall take them up in that order.

While variously stated, the twenty-two reasons of appeal directed to the decision are in substance that the trial justice misconceived the law and the evidence. Of course if he did so his decision will not be given the persuasive force ordinarily accorded such a decision. We have examined that part of the complainants' brief on this phase with particular care and when comparing it with the rather long and what seems to us carefully prepared rescript read in the light of the whole record, we are satisfied that the trial justice committed neither of these errors.

At the hearing counsel for complainants admitted that he had to prove his case "by clear and convincing evi-

dence." The trial justice said in his rescript: "Both reason and authority dictate that the complainants should be able to recover only upon proof that is clear and convincing." He then proceeded to cite *Spencer* v. *Spencer,* 25 R. I. 239, *Messier* v. *Rainville,* 30 R. I. 161, *Tillinghast* v. *Harrop,* 63 R. I. 394, *Deatte* v. *Duxbury,* 66 R. I. 1, and *Mann* v. *McDermott,* 77 R. I. 142, which fully support the quoted rule which we believe is recognized practically throughout this country.

The complainants claim that the trial justice disclosed in his rescript that he felt a contract such as the one here in question could only be proved by direct evidence. We do not draw that conclusion from what the trial justice said. Although he recognized that the two sets of wills and codicils were reciprocal, he concluded that they did not of themselves prove that they were the result of a contract. He then proceeded to examine the other evidence. The complainants concede that the trial justice's statement that the mere existence of reciprocal wills did not prove that they were the result of a contract was correct and their main authority is to this effect. *Minogue* v. *Lipman,* 25 N. J. Super. 376, 393. This is equally true of *Oursler* v. *Armstrong,* 170 N.Y.S.2d 458, cited to us by complainants since the instant cases were argued. The complainants, however, claim the facts of this case show that the wills and codicils were actually the result of a contract.

The complainants criticize the trial justice's statement to the effect that he was satisfied from the character of this couple that neither would seek an agreement from the other relative to the disposition of their property. In their brief complainants say: "The keynote of their happy married life was that each had complete confidence in the judgment and conduct of the other." From this situation complainants seek to draw the conclusion that these documents were the result of a contract. The trial justice drew the contrary conclusion.

Assuming that complainants' inference is a reasonable one, we think it is clear that the one drawn by the trial justice was at least as reasonable. The drawing of inferences is the function of the trier of the facts, and if that trier draws a reasonable inference, although another equally reasonable inference might be drawn, the inference drawn by the trier will stand. Here complainants had the burden of proof. We believe the conclusion of the trial justice on this phase is the crux of this case. Happily married couples having complete confidence in each other do not seek to bind one another by contracts and such seems to be the general view of other courts. See *Wilson* v. *Gordon,* 73 S. C. 155, 163; *Ridders* v. *Ridders,* 156 Ore. 165.

The "Dear Will" letter is strong proof of Mrs. Williams' point of view. The complainants make no comment whatever about Mr. Norton's testimony to which we have referred, but we think it strongly indicates that Mr. Williams had confidence in his wife's carrying out his plans, but it does not indicate that he felt she was legally bound to do so. While it is quite clear that these wills and codicils were talked over and were the result of prearranged plans between this couple, the evidence from which either could have reasonably concluded that one was making his or her will or codicil in exchange for a promise of the other to make the will or codicil that he or she made is slight if not entirely lacking. In a discussion of agreements between spouses or persons who are engaged, it is stated in 1 Williston on Contracts (rev. ed.) at page 39: "The real difficulty, however, in finding a contract in such cases is, that the parties do not manifest an intent to make a bargain, that is to exchange a promise for an agreed consideration."

At pages 27 and 28 of his Contracts to Make Wills, published in 1956, Professor Bertel M. Sparks of New York University says: "The clear weight of authority, and certainly the sounder view, is that the mere presence of either joint or mutual wills does not raise any presumption that

they were executed in pursuance of a contract. Nor is this rule altered by evidence that the parties had 'agreed' to the making of such wills. *Of course they had so agreed.* The mere presence of such wills reveals that the parties *must* have talked the matter over and *must* have arrived at an understanding or agreement concerning their testamentary dispositions. Such discussions and such understandings between persons of close affinities, especially between husbands and wives, are not unusual and *the fact that they have taken place* is no indication that there has been any thought of a binding contract." (italics ours)

Recurring to complainants' attack upon the decision, we note they disagree with the statement of the trial justice that there is nothing in Mrs. Williams' wills executed after her husband's death which indicates a contract. The very first will that Mrs. Williams executed after her husband's death was made less than two weeks after he was buried. Under that will she gave Wellington four times as much as she gave to any other niece or nephew of Mr. Williams. This can hardly be said to be evidence that the contract between this couple, assuming there was one, bound her to treat the nieces and nephews *equally*.

The complainants take the position that the trial justice more or less ignored Mr. Rathgeber's testimony. In point of fact he discussed the only important part of it, namely, that concerning the statement Mr. Rathgeber says Mrs. Williams made in December 1945. The trial justice accepted his earlier version of the statement attributing his latter version to lapses of memory and this too after Mr. Rathgeber had persisted in denying the making of this memorandum until his local counsel fairly forced him to admit it. The memorandum contains nothing about equality. Mr. Rathgeber's earlier statement, as the trial justice said, does not prove the contract alleged in the amended bill of complaint. There is nothing in complainants' brief suggesting that they can win on any contract other than the

one alleged which in turn is different from the one set up in their claims filed in the probate court. Since the trial justice found there was no contract primarily because this couple did not manifest an intention of making a bargain, such questions are not reached.

Having in mind that a year before Mrs. Williams had made a will giving all the nieces and nephews a sum in excess of a million dollars, which was more than she received from her husband, we see no occasion for her to make any such statement as is attributed to her by Mr. Rathgeber. From the picture painted of Mrs. Williams by both sides, she does not appear to have been a person who would make such a voluntary admission of a breach of faith with her deceased husband. See *Deatte* v. *Duxbury*, 66 R. I. 1, 9. In view of his decision it is apparent that the trial justice did not consider this evidence as meeting the clear and convincing test, and he was justified in so doing.

Several times in their brief complainants advert to the fact that the trial justice made no reference to the changed conditions in which Mrs. Williams lived after her husband's death, particularly towards the end. It is true he made no such reference. They refer to Wellington's second marriage and his increasing close relationship with Mrs. Williams. In view of the fact that she gave Wellington four times as much as she gave any other niece or nephew *before* his first wife died, makes the fact of his remarriage relatively unimportant.

The nieces profess to see no reason for the trial justice saying: "It would seem if any agreement relative to property were necessary that Mr. Williams would be the one seeking it * * *." His wife had four or five times as much money as he had and the alleged contract is that each would give to the other "all or substantially all of his or her property and estate"—a rather good trade for him. Doubtless this is what the trial justice had in mind.

They also argue that the trial justice unduly emphasized the failure of Mr. and Mrs. Williams to tell Mr. Harvey about the contract. This is hardly the case. The trial justice emphasized the fact that if Mr. Harvey had been told he would have remembered it. He saw them about thirty times. The failure to make such a statement could properly have been given considerable weight by the trial justice. See *Tillinghast* v. *Harrop,* 63 R. I. 394, 406.

The complainants rely heavily upon *Minogue* v. *Lipman, supra,* and that case on appeal in the appellate division of the superior court, 28 N. J. Super. 330. There a widow and widower, each having children, married. She owned a parcel of real estate in New York and during their marriage they purchased a parcel of land in New Jersey as tenants by the entirety. He contributed to the improvement of the first parcel to the extent of 20 per cent of its value and paid 70 per cent of the purchase price of and the cost of improvement to the second parcel. On this state of the titles if he died first his widow would have title to both parcels. They went to a lawyer and made reciprocal wills in which each left 20 per cent of the first parcel to his children and 80 per cent to her children, and 70 per cent of the second parcel to his children and 30 per cent to her children. When receiving instructions to draw the will this way and knowing the state of the titles the attorney pointed out to the husband that he had nothing to will and he said: "That will be taken care of." He then asked the wife if that was the way she wanted it and she replied: "That is the way he wants it so what can I do?" There was documentary evidence that proved the percentage contributions that each made to the value of these two parcels.

Both told relatives that they had settled their affairs. The wife was expected to die first as she was suffering from cancer. He, however, died first and immediately the widow who, as noted, had title to both pieces of property, made a new will giving all this property to her children. On the

evidence the trial justice found that the two wills were made as a result of a contract and that the surviving widow, having taken the life estate of his property given her in his will, had no right to make a new will revoking the above provisions of her first will. This decision was affirmed on appeal. Both courts noted that the mere fact that the wills were reciprocal was not of itself evidence of a contract. In the New Jersey case the credible outside evidence so completely dovetailed with the wills themselves that it was evident that they were the result of an agreement. In the instant case the evidence outside the wills is lacking. Furthermore, the trial justice here found that Mr. and Mrs. Williams had no intention of binding one another.

In *Oursler* v. *Armstrong*, 170 N.Y.S.2d 458, a divorced man with two children married again and two children were born of the second marriage. He was equally devoted to both groups of children. Some twenty-five years later he and his second wife consulted an attorney and expressed a desire to protect the children of both marriages and it was finally decided, on the advice of counsel, to make reciprocal wills. However, after he died his widow changed her will whereby she cut out the children and grandchildren of the first marriage. The trial justice found that the making of the wills was a result of an agreement and on the facts he may well have done so.

It seems to us that the facts in the New Jersey and the New York cases are substantially different from those in the case at bar since in each of those cases the trial court found substantial evidence in addition to the fact that the wills were reciprocal. The trial justice in the instant case found no such credible evidence, and that he looked for it is shown by the fact that, after stating that reciprocal wills were not in themselves evidence of such an agreement, he went on to say: "In the search for proof of an alleged agreement it is necessary to consider testimony that was given at the hearing."

The conclusions of other fact finders, even where the facts are substantially the same, seldom show that the fact finder in the case under consideration was not justified in arriving at an opposite conclusion. Furthermore both of the above-cited cases involved the children of the makers of the will, whereas here the real complainants are nieces of the husband with only one of which he had much to do.

The complainants' contention that Mr. Harvey would not have brought this case unless he believed he had a case is, of course, of no weight. He may have felt there was some foundation for bringing the case and hoped that favorable testimony would turn up.

Bearing in mind that Mr. and Mrs. Williams had consistently and persistently refused to create trusts, the argument of complainants at the end of this point that these wills and codicils did in effect create a trust is not convincing. Mrs. Williams was a lawyer, Mr. Williams was an intelligent person, and they both had the trust angle explained to them. In such circumstances it is not at all likely that if they had any idea of binding each other they would not have adopted this device which would have accomplished this result, rather than leave a contract without any direct evidence of its existence.

After referring to the "Dear Will" letter, Mr. Tanner's testimony and Mr. Harvey's statement, complainants state that the way in which the trial justice "treats such testimony shows a distinct inclination to interpret it most favorably in behalf of respondents." Triers of the facts generally treat the testimony on which they rely more favorably than that on which they do not rely and we cannot say that the trial justice was clearly wrong in so doing here.

The cases on these reasons of appeal involve no disputed question of law or equity. It is purely a question of fact. The complainants had the burden of proof and it was a heavy one. However, there is ample support in the evidence and the reasonable inference deducible therefrom

for the conclusion of the trial justice that they had not sustained that 'burden. In such circumstances the finding of the trier of facts will not be disturbed. All the reasons of appeal directed to the decision are without merit.

We now turn to the challenged rulings on evidence.

The first reasons of appeal under the second group have to do with the exclusion of evidence offered under general laws 1938, chapter 538, §6, now G. L. 1956, §9-19-11, which reads: "A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith 'before the commencement of the action and upon the personal knowledge of the declarant." The complainants preface this part of their brief by citing several Rhode Island cases decided under this statute and a Massachusetts case from which jurisdiction the statute was undoubtedly copied. They leave it to us to apply these cases to the various rulings.

Reason of appeal numbered 26 has to do with the following question asked of Mr. Norton: "Did Mr. Williams ever tell you or did Mr. Williams ever discuss any arrangements which he had with his wife, with you? In other words, did Mr. Williams ever say anything to you about any agreement as far as the disposition of the property was concerned?" His answer was: "Only that they had it agreed to carry out this mutual—I won't say mutual, 'but complimentary [complementary] parts of their codicil, in the way that the other one had specified in their codicil." The trial justice considered that the question was proper but that the answer was not and he granted a motion to strike the answer. The answer should have been "yes" or "no." The trial justice's ruling was correct. It is general law that a ruling will be supported if right no matter what reasons the trial justice gave.

Reason of appeal 28 involves the following question: "And was the will and codicil for one or more than one? A. Both Mr. and Mrs. Williams had a will and a codicil

prepared by me. I informed Mr. Williams that customarily when a will is redrawn, that you incorporate in the will all the items that are included in the will, and in this case, in the codicil. Mr. Williams said, 'No. It's been agreed between Mrs. Williams and myself — ' '" The trial justice struck the answer and he was correct for the reasons already given in disposing of the previous ruling. However, in both cases the trial justice ruled that the answers were objectionable because the witness spoke of an agreement which involved something that Mrs. Williams must have said. This then makes the important part of the answers hearsay on hearsay which is not authorized by the statute. *Dow* v. *Dow*, 243 Mass. 587, which was decided before we adopted this statute from Massachusetts. In *Gemma* v. *Rotondo*, 62 R. I. 293, it was held that we should follow the construction of the statute put upon it by the highest court of the state from which it was adopted unless there is strong reason to do otherwise, and we find no such reason here. In *Paulson* v. *Paulson*, 50 R. I. 86, this court pointed out the dangers inherent in the admission of declarations of deceased persons and they would be greatly multiplied in the case of hearsay on hearsay. Here we must have clear and convincing evidence.

Reason of appeal 30 involves the following question and answer which was stricken: "Q. Now, Mr. Rathgeber, I think you told us about the drawing up of the codicils to the wills, did Mr. Williams tell you that he wanted them drawn up in that form? A. Well, he said it was his agreement with Mrs. Williams." The answer should have been "yes" or "no" and the answer was properly stricken. However, what we have said relative to the use of "agreement" applies with equal force to this ruling.

The last reason of appeal 31 in this second group involves the following offer of proof.

"Mr. Jordan: At this time then, may it please the Court, at this time I would like to make an offer of

proof on the record, that through Mr. Norton and through Mr. Rathgeber, we were prepared to prove that there was an agreement between Mr. and Mrs. Williams. That Mr. Williams prior to the time of this suit, during his lifetime, and that Mr. Williams is now dead, that Mr. Williams set forth that agreement in detail to both men, that is both to Mr. Norton and to Mr. Rathgeber, he stated that he had an agreement whereby his will was drawn so as to leave everything to his wife and then a codicil drawn, and in the codicil, if his wife predeceased him everything that he received from her minus One Million Dollars would go as she directed in her last codicil, his own estate plus One Million Dollars was to go to his family as he directed in that codicil.

At the same time, Mrs. Williams drew her codicil, her will, leaving everything to Mr. Williams if he survived her. If Mr. Williams failed to survive her, then Mrs. Williams codicil was drawn so that all of her estate minus One Million Dollars was left as she directed, One Million Dollars and everything that she received from her husband's estate, was left to his family as he directed in his last codicil."

To this offer the trial justice simply said: "It is upon the record."

It is true that an attorney is not compelled to continue a line of questions after the court has clearly indicated that he will not allow the questions to be answered, but the trial justice had never indicated that he would not allow the witness to testify as to declarations of *fact* by Mr. and Mrs. Williams. He had simply refused to allow hearsay on hearsay. Had these witnesses been able to give the evidence suggested by the offer they should have been asked specific questions to elicit answers within the rule. We consider this offer improper.

Furthermore, the word "agreement" appears several times in the first paragraph of the offer and falls within the rulings we have already sustained. An offer which contains anything inadmissible is properly rejected even

though all the rest may be proper. The trial justice is not obliged to do the sifting. In *Bristol* v. *Noyes,* 106 Vt. 418, where it was held first, that the ruling will be sustained if correct even though the trial justice gave the wrong reason, and second, where a part of the evidence included in the offer was inadmissible, the whole offer was properly rejected. See also *Jones* v. *Dubuque Fire & Marine Ins. Co.,* 317 Pa. 144.

All these reasons of appeal are without merit.

The second part of the second group of the reasons of appeal has to do with the trial justice's refusal to allow one of the attorneys for complainants, who had previously done considerable legal work for Mrs. Williams, to testify as to a statement she made to him. The complainants rely upon 8 Wigmore on Evidence (3d ed.) §2310, but, as that authority states, the cases are not in harmony as to whether the statement of the client must be germane to the subject of the conference with the attorney and this is fully borne out by the cases in the footnote. We find no authority on this point in this jurisdiction. As the offer was made, we cannot say that Mrs. Williams' statement was elicited as a result of the matter concerning which she had gone to Mr. Roman to discuss. We are satisfied, however, that the trial justice could properly have found that she spoke to him not as a friend but as a lawyer and we consider that this is the proper test to apply. Such a rule will, we believe, give proper scope to the privilege which should not be whittled away by fine distinctions. In *Moore* v. *Bray,* 10 Pa. St. 519, 524, one of the cases in the notes in 8 Wigmore on Evidence, *supra,* it was stated:

> "It is true, the rule does not embrace the disclosure of collateral facts, made during accidental conversations, held irrespective of the professional character of the recipient. But the circle of protection is not so narrow as to exclude communications a professional person may deem unimportant to the controversy, or the brief-

est and lightest talk the client may choose to indulge with his legal adviser, provided he regards him as such, at the moment. To found a distinction on such a ground, would be to measure the safety of the confiding party by the extent of his intelligence and knowledge, and to expose to betrayal those very anxieties which prompt those in difficulty to seek the ear of him in whom they trust, in season and out of season."

All of these reasons of appeal are without merit.

In each cause the complainants' appeal is denied and dismissed, the decree appealed from is affirmed, and each cause is remanded to the superior court.