**Debra L. MARSOCCI**

v.

**David A. MARSOCCI.**

No. 2005–149–A.

Supreme Court of Rhode Island.

Dec. 15, 2006.

Alfred Factor, Esq., for Plaintiff.

Donald R. Lembo, Esq., North Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on November 1, 2006, on cross-appeals by the plaintiff, Debra L. Marsocci (Debra or plaintiff), and the defendant, David A. Marsocci (David or defendant), from a Family Court decision pending entry of final judgment of divorce. The defendant appeals the trial justice's decision that invalidated a premarital agreement (agreement) based on unconscionability, involuntariness, and lack of fairness. The defendant also assigns error to the amount of child support awarded to the plaintiff. In her appeal, the plaintiff argues that the Family Court erred in its equitable distribution of assets and alleges that she should have been awarded one-half of the marital estate, rather than the one-third that the trial justice ordered.

For the reasons stated in this opinion, we vacate the judgment and remand this case to the Family Court for further proceedings consistent with this opinion.

### Facts and Travel

The facts in this case are largely undisputed. Debra L. Tetreault and David A. Marsocci were married on August 26, 1995. On August 22, 1995, four days before the wedding, the parties signed a premarital agreement. At that time, David was represented by counsel; Debra was not. However, both parties declared that the other had "fully disclosed [his or her] present approximate net worth" and that each party "had full opportunity for review of [the] agreement and both parties acknowledge their understanding of the effect and content" of it. As his separate property, David listed six parcels of real estate, both developed and undeveloped, three vehicles, and a business checking account; however, no specific values were assigned to these assets. Debra had no assets. The agreement was signed by the parties and properly witnessed. Their son, Matthew, was born six months later.

In July 2002, Debra filed a complaint for absolute divorce. The parties' testimony

revealed that the marriage was not a peaceful union. In her decision, the Family Court justice described the "animosity between these two people [as] palpable." Debra described an unhappy marriage: "It was constant yelling, screaming, putting me down, negativity, hostility every minute we were together ." David alleged that Debra lost vast amounts of money as a day trader and made personal loans to family members, using his money. The trial justice granted each party a divorce on the grounds of irreconcilable differences that led to the irremediable breakdown of the marriage. The parties were granted joint custody of Matthew, with physical placement to be with Debra.

Before addressing the distribution of the couple's assets, the Family Court sought to determine whether the premarital agreement was valid and enforceable. The trial justice declared that as the party challenging the validity of the agreement, Debra had a "heavy burden." She also noted that it was Debra's contention that the agreement was not enforceable because property that was described as separate property at the time of the marriage had transmuted into marital property. David insisted that the agreement was valid and disputed Debra's claim of an interest in the real estate that he owned.

■ In Rhode Island, the enforceability of premarital agreements is controlled by the Uniform Premarital Agreement Act (UPAA), G.L.1956 § 15–17–6. The trial justice declared that it was incumbent upon Debra to prove, by clear and convincing evidence, that:

> "[T]he agreement was not executed voluntarily; that the agreement was unconscionable when it was executed, as well as before; that the party [challenging the agreement] was not provided a fair and reasonable disclosure of the property or financial obligations of the other party, and did not expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure already provided."

With respect to the issue of voluntariness, the trial justice looked for guidance to and relied upon the California statutory definition of voluntariness, which contains a presumption that a premarital agreement was not voluntary "unless the Court finds, among other things, that the party against whom enforceability is sought * * * if unrepresented * * * was fully informed of the terms and basic effects of the agreement, as well as the rights and obligations he or she is giving up."[1]

---

1. *See* Cal. Fam. Code § 1615 (West 2004) entitled "Unenforceable agreements; unconscionability; voluntariness") for the pertinent section of the California enactment of the UPAA. Subsections (1) through (5) of § 1615(c) as to voluntariness provide:

"(c) * * * [I]t shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following:

"(1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel.

"(2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed.

"(3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall

The trial justice found that each asset David had listed was unaccompanied by a dollar value; nor was there a written waiver of Debra's right to disclosure of the value of her husband's property and his financial obligations. She stated that although there was scant testimony about the circumstances under which it was executed, the agreement could "speak for itself." She then went on to note that although representation by separate counsel is not required, when, as here, a party is unrepresented, "it is vital to the validity of the prenuptial agreement that there be full and specific information regarding the assets and the obligations of each signator[y]" and that in this case "[t]here is no information contained in this agreement as to the values of any of Mr. Marsocci's assets."

The Family Court then addressed the question of unconscionability and declared that unconscionability relates to "the nego-

tiations between the parties [designed] to protect against over-reaching, concealment of assets and sharp dealing." The trial justice declared that premarital agreements must be scrutinized closely because of the nature of the fiduciary relationship between the parties, a relationship that does not exist between parties to traditional arms-length contracts. She noted that this agreement provides that Debra "has nothing and agrees to end up with nothing after her marriage; the so-called after-acquired property clause."[2] She further found that a "prenuptial agreement in which one party acquires all to the exclusion of the other party is not a substantively fair agreement" and that it "defies the basic underpinnings of the marital relationship; namely, that marriage is a partnership where both parties through their mutual efforts obtain assets subject to equitable distribution in the event they cease getting along."

be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information.
"(4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.
"(5) Any other factors the court deems relevant."

2. Nowhere in the document itself does the terminology relating to after-acquired property precisely appear. The first section, which sets forth the property ownership provisions of the agreement, provides:

"Such ownership and use of Prior Property shall include income, interest, rents, dividends, and stock splits, which said income shall be considered prior acquired property.
"There shall be separate ownership of property acquired and owned prior to

the marriage and any proceeds therefrom. After the marriage of the parties, each shall continue to hold and retain separate title and rights in and to any and all property each owns at the time of marriage (hereinafter called Prior Property). Each party acknowledges that the other shall have full and unrestricted right to sell, transfer, assign, encumber, or otherwise dispose of such separate Prior Property, free from any claim, demand, community property rights, or statutory interest of the other which might have arisen in any way because of the marriage of the parties.
"Such separate ownership of assets shall also apply to any substitutions and replacements of such Prior Property obtained from the proceeds of disposition of such Prior Property during the marriage."
Additionally, nothing in the language of the premarital agreement precluded either party from claiming alimony; however, the trial justice denied alimony to both parties. Because we are remanding this case to the Family Court, the issue of alimony may be revisited.

The court then went on to find by clear and convincing evidence that:

"the agreement was not only involuntarily executed due to the failure of the agreement to fully disclose the value of Mr. Marsocci's assets and the lack of any waiver of said information signed by Mrs. Marsocci, but further due to the fact that the agreement is unconscionable * * * [and demonstrates] over-reaching and sharp dealing."

After she invalidated the premarital agreement, the trial justice then turned to the issue of equitable distribution of the marital assets. The court discussed both the doctrine of transmutation of premarital assets into marital assets and the doctrine of "active appreciation" of the value of separate assets, under which the increase in value of the assets becomes a marital asset. *See, e.g., Horton v. Horton*, 891 A.2d 885, 889 (R.I.2006) (declaring that *"appreciation in value* of property held in the name of one of the spouses prior to the marriage should be assigned as a marital asset"); *Stephenson v. Stephenson*, 811 A.2d 1138, 1142 (R.I.2002) (quoting *Cloutier v. Cloutier*, 567 A.2d 1131, 1132 (R.I. 1989) (stating that "property can be converted from nonmarital property into marital property if changed in form and put into joint names")). The court ruled that although defendant may not have intended to transmute premarital property into marital property, by depositing the proceeds from the rentals and sales of these properties into accounts to which plaintiff had access, he had taken a step that "result[ed] in these accounts being transmuted." In addition, the trial justice found that there had been active appreciation of the value of separately owned property and that this appreciation was a marital asset subject to distribution.

The court accorded Debra approximately one-third of the marital estate consisting of the marital domicile and its contents; David received all other real estate, amounting to approximately two-thirds of the marital estate. Debra also received money in a T.D. Waterhouse account and David was awarded all of the accounts associated with his business. The court viewed this distribution as equitable, "[i]n view of both [Debra's] conduct [in having at least two intimate relationships after the parties separated] and her dissipation of assets[.]" David was ordered to pay $225 per week in child support, and neither party was awarded alimony. Both parties appealed, and it is these appeals that are now before this Court.

### Issues

On appeal, David contends that the trial justice erred in her determination that the agreement was invalid and unenforceable. The defendant argues that Debra failed to prove, by clear and convincing evidence, the elements necessary to invalidate a premarital agreement as set forth in § 15–17–6. Specifically, defendant argues that standing alone, a finding of unconscionability is not sufficient to invalidate a premarital agreement because proof that the agreement was not voluntarily executed *and* the nondisclosure of assets or a waiver of disclosure also are essential elements to a determination that the agreement is not enforceable.

As his second point of error, David argues that the trial justice was clearly wrong in ordering that he pay $225 per week in child support and suggests that a much lower figure was warranted in accordance with the child support statute, G.L. 1956 § 15–5–16.2, based on his adjusted gross income.

In her cross-appeal, Debra argues that under the equitable distribution statute, § 15–5–16.1, she was entitled to one-half of

the marital estate, rather than the one-third that the court awarded.

## Standard of Review

 Questions of statutory interpretation are reviewed *de novo* by this Court. *Webster v. Perrotta,* 774 A.2d 68, 75 (R.I. 2001) (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I.2001)). "As the final arbiter on questions of statutory construction, * * * 'this Court examines statutory provisions in their entirety, attributing to [an] act the meaning most consistent with the policies and purposes of the Legislature.'" *Commercial Union Insurance Co. v. Pelchat,* 727 A.2d 676, 681 (R.I.1999) (quoting *In re Advisory to the Governor (Judicial Nominating Commission),* 668 A.2d 1246, 1248 (R.I.1996)). "[W]hen we examine an unambiguous statute, 'there is no room for statutory construction and we must apply the statute as written.'" *State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998) (quoting *In re Denisewich,* 643 A.2d 1194, 1197 (R.I.1994)).

## The Premarital Agreement

In Rhode Island, the enforceability of a premarital agreement is governed by the Uniform Premarital Agreement Act as codified in § 15–17–6. Section 15–17–6 states:

"(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

"(1) That party did not execute the agreement voluntarily; *and*

"(2) The agreement was unconscionable when it was executed *and,* before execution of the agreement, that party:

(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; *and*

(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"(b) The burden of proof as to each of the elements required in order to have a premarital agreement held to be unenforceable shall be on the party seeking to have the agreement declared unenforceable and must be proven by clear and convincing evidence.

"(c) If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

"(d) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." (Emphases added.)

 We have noted that when the Legislature enacted the provisions of § 15–17–6, it "clearly evidenced the intent to preserve the validity of such agreements [and] * * * [maintain] the integrity of such agreements[.]" *Penhallow v. Penhallow,* 649 A.2d 1016, 1021 (R.I.1994). "To that end, the Legislature placed a significant burden upon the party seeking to render the agreement unenforceable—that party must prove *all* of the elements in §§ 15–17–6(a)(1) and (2), and must do so by clear and convincing evidence." *Rubino v. Rubino,* 765 A.2d 1222, 1225 (R.I. 2001). Thus, it was Debra's burden to prove that she did not execute the agree-

ment voluntarily *and* that it was unconscionable when it was executed *and* that she was not provided with a fair and reasonable disclosure of David's estate and his financial obligations before she signed the agreement, *and* that she did not voluntarily and expressly waive such disclosure in writing.

## Voluntary Execution

In addressing the element of voluntariness, the Family Court justice explicitly adopted the California definition of voluntary execution as applied to the UPAA. She declared:

"[A] Court will *presume* that a [premarital agreement] was executed involuntarily unless the Court finds, among other things, that the party against whom enforceability is sought, in this case Mrs. Marsocci, if unrepresented, as she was, was fully informed of the terms and basic effects of the agreement, as well as the rights and obligations he or she is giving up." (Emphasis added.)

■ This definition impermissibly creates a presumption of involuntariness, a concept that this Court has never embraced in construing our statute. We are satisfied that § 15–17–6(b) unambiguously provides that: "[t]he burden of proof as to each of the elements required in order to have a premarital agreement held to be unenforceable *shall be on the party seeking to have the agreement declared unenforceable * * *.*" (Emphasis added.) Furthermore, "the act does not require the presence of independent counsel as a condition for * * * enforceability[;]" *Penhallow,* 649 A.2d at 1022, nor has this Court

ever required parties to a premarital agreement to be represented by counsel.[3]

The trial justice found, by clear and convincing evidence, that the agreement was involuntary and unconscionable "due to the failure of the agreement to fully disclose the value of Mr. Marsocci's assets and the lack of any waiver of said information" and "that Mrs. Marsocci, unrepresented, effectively gives up any interest in any assets obtained during the marriage, but for the marital domicile which now stands in joint names."

■ To the extent that the Family Court justice based her finding of involuntariness on the fact that David failed to fully disclose the value of his assets and that Debra did not waive that disclosure, we deem this error. Whether the agreement was voluntarily executed and whether there was adequate disclosure of the value of David's assets are separate factors that must be proven by clear and convincing evidence. Proof of one factor does not establish the other.

Section 15–17–6(b) is clear in its mandate that the party challenging a premarital agreement must prove *"each* of the [required] elements" by "clear and convincing evidence." (Emphasis added.) Proof that the agreement was not executed voluntarily, as required by § 15–17–6(a)(1) is separate from a finding of unconscionability pursuant to § 15–17–6(a)(2) and the § 15–17–6(a)(2)(i) requirement of disclosure of "the property or financial obligations of the other party." Thus, unconscionability and nondisclosure of assets (or waiver) does not mean that the agreement was not executed voluntarily. By its terms, § 15–17–6 clearly requires proof

---

**3.** Although parties to a premarital agreement are not required to have counsel for the agreement to be upheld as voluntary, we nonetheless agree with the proposition that "{w]hether a party obtained independent le-

gal advice is a significant consideration in evaluating whether an antenuptial agreement was voluntarily and understandingly made." *Holler v. Holler,* 612 S.E.2d 469, 476 (S.C.Ct. App. 2005).

that the party challenging the agreement "did not execute the agreement voluntarily[.]" This fact cannot be determined solely from a review of the agreement, because proof of the circumstances under which the agreement was signed is required.

We discern no evidence in the record that suggests that Debra did not execute this agreement voluntarily. Accordingly, we are satisfied that the trial justice's finding that Debra did not execute the agreement voluntarily is clearly wrong.

## Unconscionability

■ The "issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." Section 15–17–6(d). In addressing this element, the trial justice found that the agreement was unconscionable because Debra was unrepresented by counsel and "effectively [gave] up any interest in any assets obtained during the marriage, but for the marital domicile[.]" Although the parties to a premarital agreement may proceed without counsel, this is a factor that is relevant to a finding of unconscionability. The trial justice also found that "[a] prenuptial agreement in which one party acquires all to the exclusion of the other party is not a substantively fair agreement and defies the basic underpinnings of the marital relationship[.]" We agree.

The agreement respecting the parties' separate property interests provides:

"Such ownership and use of Prior Property shall include income, interest, rents, dividends, and stock splits, which said income shall be considered prior acquired property.

"Such separate ownership of assets shall also apply to any substitutions and replacements of such Prior Property obtained from the proceeds of disposition of such Prior Property during the marriage."

■ The trial justice noted that David's business, both at the time the agreement was executed and at the time of the divorce, involved "selling one property and purchasing another, and mortgaging one to obtain another, and so on and so forth, using the rent for same to pay his personal and his marital debt." The language of the agreement purports to isolate as separate property not only the actual holdings explicitly listed as David's "Prior Property," but also seeks to reach into the future to prevent a marital interest arising from income produced as a result of David's ownership of these assets, notwithstanding the fact that this income comprised the majority of David's earnings throughout the marriage. Given the nature of David's business at the time the agreement was executed and throughout the course of the marriage, we agree with the trial justice that this language clearly "defies the basic underpinnings of the marital relationship; namely, that marriage is a partnership where both parties through their mutual efforts obtain assets subject to equitable distribution in the event they cease getting along[,]" and as such was unconscionable at the time it was executed. Unconscionability alone, however, will not defeat a premarital agreement.

## Disclosure

■ Finally, the Family Court justice rested her decision on a finding that "[t]here is no information contained [within the] agreement as to the values of any of Mr. Marsocci's assets."[4] The UPAA does

---

4. Exhibit A attached to the premarital agreement lists David's "Prior Property" in full as:
 "Real Estate:

808 Point Judith Road, Narragansett, RI
Lot on Ponagansett Parkway, Narragansett, RI

not require that the assets and financial obligations of the parties be set forth in the agreement. Rather, a party's failure to provide a fair and reasonable disclosure of the property or financial obligations to the other party is a factor that must be proven by clear and convincing evidence to defeat the agreement. Although brief and lacking in detail, David's assets were listed in an addendum to the agreement, and each party acknowledged that the other had "fully disclosed [his or her] present approximate net worth[.]"[5] We deem this acknowledgement to constitute adequate compliance with the mandate that each party be provided with "a fair and reasonable disclosure of the property or financial obligations of the other party[.]" Section 15–17–6(a)(2)(i).

After careful review of the agreement and the record in this case, we are of the opinion that Debra failed to establish, by clear and convincing evidence, all of the elements set forth in § 15–17–6. Thus, we hold that the agreement is valid and shall control the apportionment of assets between the parties. We are of the opinion, however, that the agreement does not preclude the Family Court from assigning the appreciation in value or an interest in David's property that increased in value as a result of the efforts of either spouse during the marriage under § 15–5–16.1(b).[6]

Although counsel for defendant strenuously argued before this Court that the assets listed in the agreement and their proceeds or substitutions were forever frozen as David's separate property and, as such, should be immune to transmutation and active appreciation, he is incorrect. Premarital assets that were transmuted into marital assets and any appreciation of David's assets resulting from marital efforts are marital property subject to equitable distribution. Accordingly, we vacate the judgment and remand this case for further proceedings, including a valuation and equitable distribution of those assets comprising the marital estate.

### Remaining Issues

The remaining issues before the Court, David's appeal of the award of child support[7] and Debra's challenge to the trial

---

Lot on Durkin and Kathy Drive, Narragansett, RI
14 Deubreux Avenue, Providence, RI
Haywood Lane, Johnston, RI 4 Audrey Drive, Johnston, RI
"Personal Property:
1987 Ford 655 tractor (backhoe)
1991 GMC pickup truck
1991 Porsche 911 Carrera Coupe, VIN #WP0AB2966MS410149
Fleet checking account for his business"
This same document lists for Debra "No assets."

5. We note that although defendant's failure to include specific values does not serve to invalidate this agreement, omissions such as this are made at one's peril.

6. General Laws 1956 § 15–5–16.1(b) states in pertinent part:
"The court may not assign property or an interest in property held in the name of one of the parties if the property was held by the party prior to the marriage, but may assign income which has been derived from the property during the term of the marriage, and the court may assign the appreciation of value from the date of the marriage of property or an interest in property which was held in the name of one party prior to the marriage which increased in value as a result of the efforts of either spouse during the marriage."

7. Under § 15–5–16.2(a)(5), one of the factors to be considered in the award of child support is "[t]he financial resources and needs of the non-custodial parent." Because David is Matthew's non-custodial parent, his potential financial resources are affected by the Court's decision. As such, the trial justice may, within her discretion, opt to revisit the child support portion of her decision pending entry of final judgment.

justice's equitable distribution, are inextricably linked to the valuation of the marital estate and equitable distribution.[8] We therefore decline to reach those issues. Rather, we vacate the decree of the Family Court and remand this case for additional findings in light of our ruling about the enforceability of the premarital agreement and about the issues of transmutation and appreciation of the assets. We also direct the Family Court to make such additional findings as may be needed with respect to possibly modifying the child support order and equitably distributing the marital estate.

### Conclusion

For the reasons stated, the defendant's appeal is sustained in part. The judgment of the Family Court is vacated. The papers in the case are remanded to the Family Court for further proceedings in accordance with this decision.

Justice FLAHERTY did not participate.

---

8. Under Rhode Island's equitable distribution statute, the court may consider "[a]ny factor which the court shall expressly find to be just and proper." Section 15–5–16.1(a)(12). Additionally, under § 15–1–16.1(b), the court "may not assign property or an interest in property held in the name of one of the parties if the property was held by the party prior to the marriage, but may assign income which has been derived from the property during the term of the marriage * * *." Since both of these factors may be affected by our holding on the premarital agreement, we decline to address this issue at this time.