**Supreme Court**

No. 2015-30-M.P.

(PC 12-4078)

Sergio A. DeCurtis                    :

v.                    :

Visconti, Boren & Campbell, Ltd. et al.      :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Sergio A. DeCurtis                    :

v.                                             :

Visconti, Boren & Campbell, Ltd. et al.      :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on November 2, 2016, on certiorari from the Superior Court, seeking review of a discovery order entered on October 2, 2014, compelling production of any antenuptial or postnuptial agreements drafted, prepared, or negotiated by the defendant, Richard A. Boren (Attorney Boren), from 2005 through 2009 and in 2013, while he was employed at the defendant law firm, Visconti, Boren & Campbell, Ltd. (VBC), (collectively, defendants).  Before this Court, the defendants contend that the documents sought exceed the scope of permissible discovery, as provided by Rule 26 of the Superior Court Rules of Civil Procedure, and are protected under the attorney-client privilege, the marital privilege, and the work product doctrine.  For the reasons discussed herein, we affirm the discovery order in its entirety.

### Facts and Travel

In 2000, plaintiff, Sergio A. DeCurtis (plaintiff or DeCurtis), retained Attorney Boren to draft an antenuptial agreement.  DeCurtis and his then-fiancée, Michelle Tondreault (Tondreault), executed the antenuptial agreement on March 22, 2000, and were married on March 28, 2000.  They did not live happily ever after, and Tondreault filed for divorce in 2005.

- 1 -

The divorce petition was dismissed in a negotiated settlement that required DeCurtis and Tondreault to execute a postnuptial agreement. Attorney Boren drafted the postnuptial agreement for the couple, which was executed in November of 2005. The marriage nonetheless failed.

In June 2010, Tondreault again filed for divorce, based on irreconcilable differences that led to the irretrievable breakdown of the marriage.[1] The record reveals that the marital estate was valued at several million dollars, "the vast majority of that having been acquired during the period of coverture." On June 21, 2011, a pretrial conference was held in the Family Court. The Family Court justice explained that, after reviewing the relevant case law, statutes, and the Uniform Premarital Agreement Act, he was satisfied that the antenuptial and postnuptial agreements did not exclude any income or appreciation of assets derived by DeCurtis during the marriage from the marital estate. Thereafter, DeCurtis exhibited confusion when he was asked to articulate his understanding of this issue: "It means that my prenuptial and the post-nuptial agreement allowed me to take my income, and whatever portion of it was going to be kept separate could be kept in a separate account so it was protected." The Family Court justice explained that his finding was just the opposite. The Family Court justice continued by warning the litigants:

> "[I]f you attempted to convince the Supreme Court or this particular jurist that your income derived during the period of marriage is excluded, * * * I don't think you're going to be successful before this particular jurist; nor, is it the Court's interpretation based upon its dealings with the Supreme Court which it has over the last [thirty-seven] years, would they entertain that thought either."

---

[1] Attorney Boren also represented DeCurtis in the divorce proceedings.

The Family Court justice's statements, coupled with the extent of DeCurtis's pecuniary exposure, and the advice of counsel, led DeCurtis to settle his dispute with his wife and enter into a property settlement agreement with Tondreault on June 23, 2011. Tondreault was awarded $2,750,000 based on the equitable distribution of the assets and $1,500,000 in alimony payable over fifteen years.

On August 8, 2012, plaintiff instituted an action in Superior Court alleging attorney malpractice against defendants, contending, inter alia, that Attorney Boren negligently drafted the antenuptial and postnuptial agreements and failed to advise him that he should refrain from commingling his premarital assets with the marital estate, causing him significant loss. On October 23, 2012, plaintiff propounded the following requests for production of documents upon defendants:

> "Request No. 49:
>
> "Any and all prenuptial or premarital agreements drafted, prepared and/or negotiated by Attorney Boren from 1999 to the present and continuing up to the time of trial, with all client identifying information redacted.
>
> "Request No. 50:
>
> "Any and all postnuptial agreements drafted, prepared and/or negotiated by Attorney Boren from 1999 to the present and continuing up to the time of trial, with all client identifying information redacted."

The defendants objected, arguing that the requests sought "or could be interpreted to seek attorney work product or information related to other clients of Attorney Boren or [the law firm] not related to the plaintiff as being privileged, and subject to Rule of Professional Conduct 1.6, and beyond the scope of Rule 26." The plaintiff moved to strike defendants' objection and

- 3 -

compel further responses; the motion was heard before a Superior Court justice on November 18, 2013.

The plaintiff argued that evidence of subsequent remedial measures is admissible to prove negligence in Rhode Island, in accordance with Rule 407 of the Rhode Island Rules of Evidence, and that he was entitled to explore whether the language used in plaintiff's antenuptial and postnuptial agreements was altered in subsequent agreements drafted by Attorney Boren. The plaintiff anticipated that changes in those documents would have been made sometime in 2011, after Attorney Boren learned that the agreements he drafted for plaintiff failed to provide the protection his client allegedly was promised. Based upon the fact that the Family Court pronouncement did not occur until 2011, the trial justice granted plaintiff's motion in part, limiting production to the years 2010 through 2012. The trial justice also issued a protective order and required comprehensive redaction of the documents.

The defendants produced a single postnuptial agreement from 2010. The plaintiff renewed his motion to compel as it related to Request Nos. 49 and 50, contending that "[i]t [was] crucial [for him to] ascertain the language used by Attorney Boren in prenuptial and postnuptial agreements [designed] to protect [the] earnings and assets [of a spouse] acquired during the marriage before and after [the Family Court justice's] ruling on June 21, 2011 * * *." On September 26, 2014, the Superior Court justice acknowledged that defendants had conducted a survey as to the number of antenuptial and postnuptial agreements drafted by Attorney Boren from 2005 to 2009 and in 2013. Four antenuptial agreements and one postnuptial agreement from 2005 to 2009 and one antenuptial agreement in 2013 were produced. The Superior Court justice ordered defendants to provide these documents to plaintiffs, duly redacted and subject to

- 4 -

a protective order. The defendants sought review in this Court by way of a petition for writ of certiorari. We granted the petition on June 15, 2015.

**Issues on Appeal**

We note at the outset that this case is before the Supreme Court on an interlocutory review of a discovery order. The petition for certiorari posed the following narrow question:

> "May a former client in a legal malpractice action against his former attorney properly compel discovery from his former attorney and law firm related to documents the attorney prepared for the attorney's other clients in order to gain evidence to prove subsequent remedial measures in the legal malpractice action?"

A thorough review of the memoranda filed by the parties reveals that both sides have devoted substantial efforts discussing the admissibility and weight of the documents at issue—as well as the effect of our holding in Marsocci v. Marsocci, 911 A.2d 690 (R.I. 2006), none of which directly is on point. To be sure, the admissibility of evidence is not wholly irrelevant when determining discoverability; however, Rule 26(b)(1) requires only that the materials sought be "reasonably calculated to lead to the discovery of admissible evidence." (Emphasis added.) "The provisions of the Superior Court Rules of Civil Procedure pertaining to discovery generally are liberal, and are designed to promote broad discovery among parties during the pretrial phase of litigation." Henderson v. Newport County Regional Young Men's Christian Association, 966 A.2d 1242, 1246 (R.I. 2009). Accordingly, while some of the arguments presented to us may be viable in the Superior Court, they are of no consequence to the precise question before us.

Against that background, defendants nonetheless argue that the subject agreements are outside the scope of Rule 26. More pointedly, defendants contend that plaintiff seeks the agreements to prove that Attorney Boren took remedial measures after the Family Court's ruling in 2011; therefore, any agreements drafted before 2011 are irrelevant as they were not prepared

during that time period. The defendants also maintain that all of the agreements are protected under the attorney-client privilege, the marital privilege, and the work product doctrine, and that these privileges have not been waived. Furthermore, defendants urge this Court to recognize the sensitivity and widespread implication of the matter at hand.

## Standard of Review

"Our review of a case on certiorari is limited to an examination of 'the record to determine if an error of law has been committed.'" State v. Poulin, 66 A.3d 419, 423 (R.I. 2013) (quoting State v. Greenberg, 951 A.2d 481, 489 (R.I. 2008)). "In addition to examining the record for judicial error, 'we inspect the record to discern if there is any legally competent evidence to support the findings of the hearing justice below.'" Id. (quoting Brown v. State, 841 A.2d 1116, 1121 (R.I. 2004)). "[W]ith respect to determining the scope of Rule 26, we have repeatedly employed a de novo standard of review." Cashman Equipment Corp., Inc. v. Cardi Corp., Inc., 139 A.3d 379, 381 (R.I. 2016) (citing State v. Lead Industries Association, Inc., 64 A.3d 1183, 1191 (R.I. 2013)).

## Analysis

## Scope of Rule 26

Rule 26(b)(1) provides, in pertinent part, that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." "The philosophy underlying modern discovery is that prior to trial, all data relevant to the pending controversy should be disclosed unless the data is privileged." Cabral v. Arruda, 556 A.2d 47, 48 (R.I. 1989). Critically, our discovery rules are liberal and have been construed to "promote broad discovery." Henderson, 966 A.2d at 1246.

The plaintiff claims that the six antenuptial and postnuptial agreements drafted by

Attorney Boren are discoverable under Rule 26(b)(1) because they are relevant to demonstrate if and when Attorney Boren undertook subsequent remedial measures in the drafting of antenuptial and postnuptial agreements. Unlike many other jurisdictions, subsequent remedial measures are admissible in Rhode Island to prove negligence "[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur * * *." Rule 407; contra Thomas M. Fleming, Annotation, Admissibility of evidence of repairs, change of conditions, or precautions taken after accident—modern state cases, 15 A.L.R. 5th 119 (1993) ("Almost all American jurisdictions adhere to the rule that evidence of repairs, precautions, or like remedial measures taken after an accident may not be admitted as proof of antecedent negligence * * *."). The plaintiff has sought production of agreements drafted from 2005 through 2009 and in 2013. The defendants place emphasis on the 2005 through 2009 period, contending that these agreements are irrelevant to any subsequent remedial measures possibly taken by Attorney Boren because they antedate the 2011 Family Court ruling. The defendants claim that the 2011 Family Court decision is the triggering "event" under Rule 407 and that any agreements drafted before then, by their very nature, cannot be "subsequent." We disagree.

We have yet to define the term "event" in this context; however, the task before us is a simple one. "Event," for the purposes of proving a subsequent remedial measure, is the liability-causing conduct, not the eventual litigation itself. See Raymond v. Raymond Corp., 938 F.2d 1518, 1523 (1st Cir. 1991) (discussing Rule 407 of the Federal Rules of Evidence, which excludes evidence of subsequent remedial measures to prove negligence or culpability and stating: "Under 407, only measures which take place after the 'event' are excluded. The term 'event' refers to the accident that precipitated the suit."); see also Ranches v. City and County of Honolulu, 168 P.3d 592, 597 (Haw. 2007) (defining "event" in the context of subsequent

- 7 -

remedial measures as "the occurrence that caused the death or injury cited in the current complaint" (quoting Addison M. Bowman, Hawai'i: Rules of Evidence Manual § 407-1 (3d ed. 2006))). Rule 407 states that remedial measures are relevant if they "would have made the event less likely to occur." This phrase indicates that the "event" is the liability-causing conduct. Cf. Tucker v. Caterpillar, Inc., 564 N.W.2d 410, 413 (Iowa 1997) ("The phrase 'would have made the event less likely to occur' indicates that 'event' refers to the accident or injury rather than the manufacture or sale of the product.").

To hold that remedial measures are not to be characterized as subsequent remedial measures under Rule 407 until there has been a judicial determination of liability would be an absurd result and ignores the fact that liability arises, if at all, when the injury-causing conduct occurs. We recognize that the case at bar is unique in that it involves two causes of action, the divorce proceeding and the pending legal malpractice claim that arose out of that proceeding. Because most cases do not involve this particular legal landscape, Rule 407 would essentially be rendered superfluous were we to hold that subsequent remedial measures occur after the litigation is well on its way toward resolution. A remedial measure that follows closely on the heels of a judicial ruling would have no evidentiary value.

Additionally, we decline to hold that the controlling "event" for Rule 407 is predicated on the actual knowledge of the tortfeasor. See Doe v. Johnston, 476 N.W.2d 28, 34 (Iowa 1991) (contrasting malpractice cases with "accident" cases and holding, "[Rule 407] makes the triggering event the same as the act giving rise to negligence * * * the blood transfusion * * * was the event triggering the protection of [R]ule 407, not the doctor's later knowledge of his patient's injury"). Furthermore, any indicia of a knowledge requirement notably are absent from the plain reading of Rule 407, leaving us to ponder which party would carry the burden of

satisfying this requirement. As one of the few jurisdictions that permit subsequent remedial measures to prove liability, we decline to construe the rule in this manner. See Rule 102 of the Rhode Island Rules of Evidence ("These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." (emphasis added)); Rule 407 Advisory Committee's Note ("The proposed rule is consistent with * * * the central notion of relevancy in the rules and is based on a more realistic assessment of the policy considerations underlying the current approach.").

In the case before us, plaintiff initially retained Attorney Boren in 2000, and the antenuptial agreement between plaintiff and Tondreault was drafted in that same year. In 2005, Attorney Boren drafted a postnuptial agreement, which affirmed the terms stated in the prior agreement. The instant malpractice suit arises out of language that was included in both documents. As a result, we are of the opinion that the triggering "event" for purposes of Rule 407 is the drafting of the later document, the 2005 postnuptial agreement. Accordingly, any measures taken after 2005 would be relevant under Rule 407 and, therefore, discoverable under Rule 26(b)(1).[2]

**Privileges**

Having decided that the subject agreements meet the threshold test for discovery under Rule 26(b)(1), we now turn to the issue of whether the agreements are privileged. "Although generally favoring the reciprocal disclosure of relevant information, the rules of discovery are

---

[2] To be sure, our holding does not weigh in on whether any language changes, to the extent that they exist, are actually admissible as subsequent remedial measures in this case. The defendants have raised multiple arguments, including why language might have been changed. These arguments could ultimately affect the admissibility or the weight of this evidence in the trial court. Our holding today is limited to the determination that the six antenuptial and postnuptial agreements are discoverable and reasonably likely to lead to admissible evidence.

littered with constraints intended to comport with other competing interests * * *." <u>Henderson</u>, 966 A.2d at 1246. As Rule 26(b)(1) indicates, all relevant information is discoverable unless such information is privileged. <u>See</u> <u>Cabral</u>, 556 A.2d at 48. The defendants argue that the attorney-client privilege, the marital privilege, and the work product doctrine apply to these documents and preclude production. We acknowledge that very few jurisdictions have considered these issues in general, let alone in this precise context.

### Attorney-Client Privilege

In order "to encourage full and frank communications between attorneys and their clients," we have long recognized that "communications made by a client to his attorney for the purpose of seeking professional advice, as well as the responses by the attorney to such inquiries, are privileged communications not subject to disclosure." <u>Mortgage Guarantee & Title Co. v. Cunha</u>, 745 A.2d 156, 158-59 (R.I. 2000) (quoting <u>Callahan v. Nystedt</u>, 641 A.2d 58, 61 (R.I. 1994)). Genuine attorney-client communications are afforded the highest level of protection by our courts. <u>See</u> <u>State v. von Bulow</u>, 475 A.2d 995, 1005-06 (R.I. 1984) (explaining that the attorney-client privilege is "a narrow exception" that "limits * * * full disclosure"). However, "[t]he attorney-client privilege protects from disclosure only the <u>confidential</u> communications between a client and his or her attorney." <u>Id.</u> at 1004 (emphasis added) (quoting <u>DeFusco v. Giorgio</u>, 440 A.2d 727, 731 (R.I. 1982)). Furthermore, "[t]he privilege must be narrowly construed because it limits the full disclosure of the truth." <u>Callahan</u>, 641 A.2d at 61. The party asserting the privilege has the burden to set forth the following elements:

> "(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c)

- 10 -

for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." von Bulow, 475 A.2d at 1004-05 (quoting United States v. Kelly, 569 F.2d 928, 938 (5th Cir.), cert. denied, 439 U.S. 829 (1978)).

The attorney-client privilege is a personal privilege, see Lapan v. Lapan, 100 R.I. 498, 503, 217 A.2d 242, 246 (1966); therefore, only the client can implicitly or explicitly assert or waive the privilege. See Mortgage Guarantee & Title Co., 745 A.2d at 159. In Callahan, 641 A.2d at 61, we recognized that "an attorney may assert the privilege on behalf of a client in some situations." That alternative is not available, however, when the client is not a party to the subject lawsuit and the only interests at stake are those of the attorney. In Callahan, a law firm sued its former attorney-employee for monies owed on cases that were generated while the attorney was employed at the firm but closed after the attorney terminated his employment. Id. at 59-60. The law firm sought production of the case files and any retainer or contingency fee agreements, and the attorney objected on the basis of, inter alia, the attorney-client privilege. Id. at 60. When production was ordered by the Superior Court, the attorney sought a writ of certiorari in this Court. Id. We quashed the writ because the attorney did not have standing to assert the privilege on behalf of his clients, the true privilege holders. Id. at 61. Although the attorney had submitted an affidavit in which he attested that the clients wished to assert the attorney-client privilege, we deemed this insufficient. Id. Instead, we declared that "[i]f the clients wished to assert the privilege, then each client should have personally signed and submitted an affidavit declaring his or her intent." Id. Furthermore, the Court recognized that, had the privilege properly been invoked, the entire case file would not be protected; "[o]nly those documents containing confidential communications could have been properly withheld." Id.

In this case, defendants likewise lack standing to assert the attorney-client privilege.

- 11 -

Similar to the attorney in <u>Callahan</u>, defendants represented the privilege-holding clients. Nevertheless, those clients—the signatories to the antenuptial and postnuptial agreements—are not privy to this lawsuit. In fact, we have been advised that these clients are not aware of this controversy. While it may be accurate that a portion of the subject agreements contains sensitive and identifying information, defendants essentially are asserting the privilege in defense of their own alleged negligence, since both plaintiff's request and the Superior Court justice's order require comprehensive redaction of all identifying information. <u>See</u> <u>Callahan</u>, 641 A.2d at 61 (recognizing that "[o]nly [the attorney's] financial interests [were] at stake"); <u>cf.</u> <u>von Bulow</u>, 475 A.2d at 1007 ("Consistent with these principles of fairness, it has been held that the attorney-client privilege properly serves as a shield and not as an offensive tool of litigation."). We are of the opinion that information that may qualify under Rule 407 will remain if the agreements are produced in redacted form.

Even assuming that defendants had standing to assert the attorney-client privilege, it would not apply to the entirety of the subject agreements. It is well established that a fact does not become privileged simply because it is communicated to an attorney.[3] <u>See</u> <u>Upjohn Co. v.</u>

---

[3] The defendants direct our attention to an article published by the American Bar. However, the excerpt actually undercuts their argument:

> "This means a client can never protect facts simply by incorporating them into a communication with the attorney. For instance, a client might provide the attorney with details of its transactions with another business over the past 10 years, including dates and costs, to help the attorney draft a new contract with the business. In future litigation, the client would not have to answer any questions about what was said to the attorney or what language the attorney recommended, <u>but the client could not refuse to give the date of a prior transaction simply because the fact was discussed with the attorney</u>." Jackie Unger, <u>Maintaining the Privilege: A Refresher on Important Aspects of the Attorney-Client Privilege</u> (Oct. 2013), http://www.americanbar.org/publications/

United States, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]").  It is also illogical to categorize the drafting and review of stock language in a final and executed contract as a privileged communication between an attorney and client.  These documents represent the end product that arose from communications between the attorney and his or her client.  The intimate nature of an agreement and potentially confidential information contained therein do not render the entire agreement a privileged communication.  By its nature, the agreement stands as an arm's-length contract between two adults anticipating marriage.

Certainly, this Court recognizes that the attorney-client privilege "should not be whittled away by fine distinctions," Williams v. Rhode Island Hospital Trust Co., 88 R.I. 23, 47, 143 A.2d 324, 337 (1958); however, the privilege when applicable and properly raised protects the confidential communications between the attorney and client, see von Bulow, 475 A.2d at 1004, and not the end product, the written agreement.  In Callahan, 641 A.2d at 61, we acknowledged that "[i]t [was] highly [unlikely] that the disclosure of the three closed files would * * * involve the continuing interests of the clients."  With adequate redaction of client-specific data, the same holds true here.  Redaction may also quell any concern about the forthright disclosure of sensitive information. See Upjohn Co., 449 U.S. at 389 (explaining that the privilege "promote[s] broader public interests in the observance of law and administration of justice" and "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client").

blt/2013/10/01_unger.html (emphasis added).

Consequently, while the discussion surrounding the confidential material would be protected under the privilege, it is not clear that the confidential information itself, which is eventually memorialized into an agreement, would be protected.

Additionally and significantly, it is well established that the attorney-client privilege can be waived "when there has been disclosure of a confidential communication to a third party." von Bulow, 475 A.2d at 1005. According to the Restatement (Third) Law Governing Lawyers § 76(1) at 584 (2000), "[i]f two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter," the privilege is not waived. However, we are not convinced that a soon-to-be husband and wife executing an antenuptial agreement (or a husband and wife executing a postnuptial agreement) share a common interest with respect to the matter at hand. Although the parties intend to reach an accord regarding the disposition of their property should their union dissolve, the core function of antenuptial and postnuptial agreements is to protect the assets of each spouse from claims by the other spouse. The interest of each spouse is not in common with the other, but is adverse—even in the face of a commitment to love and cherish until death do them part. In this context, because the interests of the contracting parties are adverse, one attorney cannot ethically represent both parties in drafting and executing an antenuptial or postnuptial agreement.[4] See Article V, Rule 1.7(a) of the Supreme Court Rules of Professional Conduct ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client * * *."); In re City of Warwick, 97 R.I. 294, 297, 197 A.2d 287, 289 (1964) ("[I]t being fundamental that an attorney cannot in such circumstances represent parties having adverse interests."); Nelson v. Streeter, 65 R.I. 13, 19, 13 A.2d 256, 258

---

[4] The Uniform Premarital Agreement Act does not "require[] parties to a premarital agreement to be represented by counsel." Marsocci v. Marsocci, 911 A.2d 690, 697 (R.I. 2006); see also Penhallow v. Penhallow, 649 A.2d 1016, 1022 (R.I. 1994). However, the absence of independent representation "is a significant consideration in evaluating" whether a spouse knowingly and voluntarily consented to the agreement. Marsocci, 911 A.2d at 697 n.3.

(1940) ("Counsel undertook * * * to represent the heirs of both decedents and he had a right to do so as long as their interests were common[.] * * * [I]t is of the utmost importance that conflicting interests shall be independently represented."). See also Ware v. Ware, 687 S.E.2d 382, 389 (W. Va. 2009) ("Like divorce actions, the nature of prenuptial agreements is such that the parties' interests are fundamentally antagonistic to one another. Indeed, the purpose of a prenuptial agreement is to preserve the property of one spouse, thereby preventing the other from obtaining that to which he or she might otherwise be legally entitled. * * * [O]ne attorney may not represent, nor purport to counsel, both parties to a prenuptial agreement."). Thus, to the extent that Tondreault and her attorney were present during the preparation of the agreements and engaged in negotiations, the resulting contract is not protected from disclosure by the attorney-client privilege.

In summary, we are of the opinion that defendants do not have standing to assert the attorney-client privilege on behalf of their clients in this context. In this case, the documents are not confidential communications such that third parties were privy to the discussions surrounding the documents and their execution, thus vitiating the privilege. We conclude that the Superior Court justice amply placed safeguards on the order by requiring redaction and limiting the purpose for which the documents could be used. Adequate redaction will eliminate any sensitive or identifying information and prevent the disclosure of any confidential interests contained in the documents.

## Marital Privilege

The defendants contend that they have asserted the marital privilege as an individual basis, as well as "in conjunction with the attorney-client privilege to show the joint interests at stake for the parties who were to be married." General Laws 1956 § 9-17-13 codified the

common law marital privilege:

> "In the trial of every civil cause, the husband or wife of either party shall be deemed a competent witness; provided, that neither shall be permitted to give any testimony tending to criminate the other or to disclose any communication made to him or her, by the other, during their marriage, except on trials of petitions for divorce between them, trials between them involving their respective property rights, and under the provisions of [G.L. 1956] § 11-34.1-9."

The defendants' argument that the marital privilege applies in this context is unavailing. The parties to the six agreements are not testifying, and the production of executed contracts is not testimonial in any way. Furthermore, the parties were not married at the time the antenuptial agreements were executed. The marital privilege focuses on communications between a husband and wife, such that the communications must occur "during [the] marriage." Section 9-17-13. As applied to the postnuptial agreement, we are satisfied that adequate redaction should eliminate any communications between husband and wife that bear on confidentiality. See Bradley v. Quinn, 53 R.I. 349, 351, 166 A. 814, 815 (1933) ("[S]tatements of husband and wife to each other, when not of a confidential nature or likely to provoke marital discord, are admissible * * *."). Finally, we decline to expand the marital privilege based on its underlying policy "to encourage, protect, and perpetuate" the intimacy of marital relations. Campbell v. Chace, 12 R.I. 333, 334 (1879). See also State v. Diamante, 83 A.3d 546, 551 (R.I. 2014) ("[W]e have repeatedly held that a Court may not 'broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute.'" (quoting State v. Santos, 870 A.2d 1029, 1032 (R.I. 2005))); Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island, 943 A.2d 1045, 1049 (R.I. 2008) ("[O]ur assigned task is simply to interpret the act, not to redraft it * * *." (quoting Sindelar v. Leguia, 750 A.2d 967, 972 (R.I. 2000))). In sum, we are of the

- 16 -

opinion that the marital privilege is not applicable.

## Work Product Doctrine

"[M]aterials obtained or prepared by an attorney in anticipation of litigation are not * * * discoverable unless production of those materials [is] necessary for the preparation of one's own case." Henderson, 966 A.2d at 1246 (citing Hickman v. Taylor, 329 U.S. 495, 511 (1947)). Rule 26(b)(3) delineates:

> "Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivisions (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

In determining whether a document is immune under the work product doctrine, courts focus on whether, "in light of the nature of the document or tangible material and the facts of the case, the document can be said to have been prepared or obtained because of the prospect of litigation * * *." Cabral, 556 A.2d at 49. As a result, the filing of a lawsuit is not a prerequisite for the successful invocation of the work product doctrine, which embraces material that is prepared "when litigation is merely a contingency." Fireman's Fund Insurance Co. v. McAlpine, 120 R.I. 744, 748, 391 A.2d 84, 87 (1978).

We recognize two types of work product: opinion work product and factual work product. See Henderson, 966 A.2d at 1247-48. Opinion work product "refers to a document or other written material containing the mental impressions of an attorney or his or her legal

- 17 -

theories" and receives "absolute immunity from discovery." Id. at 1247. Factual work product casts a wider net and covers "any material gathered in anticipation of litigation." Id. at 1248. "Because factual work product does not include the actual thoughts of the attorney, it is afforded only qualified immunity from discoverability." Id. Factual work product is subject to disclosure when "the party seeking discovery demonstrates a substantial need for the materials and that it cannot obtain the substantial equivalent without undue hardship." Id. (quoting Crowe Countryside Realty Associates, Co., LLC v. Novare Engineers, Inc., 891 A.2d 838, 842 (R.I. 2006)). It is clear that the subject agreements do not contain any of Attorney Boren's mental impressions or legal theories. Thus, our review is limited to whether the six antenuptial and postnuptial agreements qualify as factual work product.

The defendants contend that the subject agreements are work product because they were prepared in anticipation of litigation—a divorce proceeding between the contracting parties. Although these documents were prepared in an attempt to simplify an unfortunate end to the client's marriage, an event that may or may not occur, we are not convinced that they rise to the level of a document prepared in anticipation of litigation. Contracts of this nature are prepared during an arm's-length transaction, by two parties with the hope that the documents collect dust in the home of a happily married couple. A potential dissolution of the marriage is far too attenuated from the creation of an antenuptial agreement to qualify as having been prepared in anticipation of litigation. Furthermore, these agreements are entered into in an effort to avoid protracted litigation by setting forth each spouse's respective rights and expectations regarding the disposition of his or her property in the event of divorce. This purpose is echoed in the underlying policy of all contracts, which are binding agreements between the parties, including the procedure and remedies available in the event of a dispute. Were this Court to declare that

these contracts constitute attorney work product, this interpretation would apply to the universe of agreements, shielding many contracts from disclosure.

The policy that underlies the work product doctrine does not lend itself to shielding these agreements. Factual work product is granted qualified immunity "to prevent an attorney from 'freeloading' on his or her adversary's work." Cabral, 556 A.2d at 48. The production of completed and executed contracts does not provide the requesting party with an unfair advantage in the litigation. We also note that, once the agreement is finalized and executed, the agreement belongs to the parties, not to the attorney who drafted it. For these reasons, we are of the opinion that final and executed antenuptial and postnuptial agreements are not work product.[5]

Even assuming, arguendo, that the antenuptial and postnuptial agreements can be categorized as factual work product, the privilege is qualified. The party seeking to overcome the document's qualified immunity has the burden to prove "(1) a substantial need of the document and (2) a resulting injustice or undue hardship from immunizing the document * * *." Henderson, 966 A.2d at 1249. The defendants argue that plaintiff cannot demonstrate a "substantial need" for two reasons—first, because plaintiff has been provided with a 2010 postnuptial agreement with language that differs from plaintiff's agreements, and second, although the documents are relevant and may lead to admissible evidence, they are not crucial to the merits of plaintiff's claim such that he can establish substantiality. We are not persuaded.

Allegedly, the 2010 postnuptial agreement that has been produced contains language that differs from plaintiff's 2001 and 2005 agreements. Nevertheless, plaintiff is unable to decipher

---

[5] That is not to say that an earlier or incomplete draft of an agreement may not be protected by the work product doctrine; by their very nature, pre-drafts may contain both mental impressions and legal strategy. Cf. Cashman Equipment Corp., Inc. v. Cardi Corp., Inc., 139 A.3d 379, 383 (R.I. 2016) (affirming the denial of a motion to compel production when the request sought production of drafts considered by the opposing expert).

if the 2010 agreement contains the first alteration of language or whether the change occurred earlier in time. The plaintiff posits that he is trying to determine the cause behind the change in language—be it our holding in Marsocci or some other event which led defendants to conclude that language they formerly employed should be altered. Although plaintiff's case may not rise or fall on Rule 407, evidence of subsequent remedial measures is "highly probative[.]" Rule 407 Advisory Committee's Note. Accordingly, we are satisfied that plaintiff has met his burden by demonstrating a substantial need for the subject agreements.

It is also clear that the plaintiff will be unable to discover this evidence through alternative channels. Certainly, the plaintiff does not know of the identity of the parties to these agreements, nor should he know. And even if he were aware, it would be overly burdensome to require the plaintiff to obtain the same agreements that are already in the defendants' possession via third-party subpoenas for documents. As a result, the work product doctrine is of no avail to the defendants. We are of the opinion that legally competent evidence in the record supports the Superior Court justice's determination on this issue.

## Conclusion

In complying with this discovery order, the defendants are directed to adequately redact all confidential information and take any additional steps they deem reasonably necessary to ensure confidentiality, including contacting their clients should that be deemed necessary. To the extent that the clients wish to assert the attorney-client privilege, the Superior Court should welcome those motions and use our discussion herein as guidance in rendering a decision.

Finally, we anticipate that the trial justice will act as an additional gatekeeper and conduct an in camera review of the documents after adequate redaction by the defendants, in order to ensure that all confidential and identifying information has been removed.

For the reasons stated in this opinion, we quash the writ and affirm the discovery order of the Superior Court.  The papers in this case shall be remanded to the Superior Court with our decision endorsed thereon.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Sergio A. DeCurtis v. Visconti, Boren & Campbell, Ltd. et al. |
| **Case Number** | No. 2015-30-M.P.<br>(PC 12-4078) |
| **Date Opinion Filed** | January 20, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Michael B. Forte, Jr., Esq.<br><br>For Defendants:<br><br>Stephen J. Brouillard, Esq.<br>Theresa L. Sousa, Esq. |